IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2018 Session

## GEOFFREY CALE VERMILYEA v. JESSICA LYNN VERMILYEA

Appeal from the Chancery Court for Dickson County
No. 2015-CV-184     Suzanne M. Lockert-Mash, Judge Sitting By Interchange

_____

No. M2017-01318-COA-R3-CV
_____

Geoffrey Cale Vermilyea ("Husband") sued Jessica Lynn Vermilyea ("Wife") for divorce. After trial, the Chancery Court for Dickson County ("Trial Court") entered its Final Decree of Divorce on June 13, 2017 ("Final Decree") declaring the parties divorced, distributing the marital assets, denying Wife's request to relocate to Canada with the parties' minor child ("Cale"), denying Wife alimony, and entering a Permanent Parenting Plan with regard to Cale. Wife appeals the Final Decree raising issues regarding the Trial Court's order denying Wife's request to relocate to Canada with Cale and denying her an award of alimony. We find and hold that the Trial Court did not err in finding that it was not in Cale's best interest to relocate to Canada and, therefore, denying Wife's request to relocate. We further find and hold that the Trial Court did not abuse its discretion in denying Wife alimony. We, therefore, affirm the Final Decree.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Irene R. Haude, Nashville, Tennessee, for the appellant, Jessica Lynn Vermilyea.

Martin Sir and Peggy Smith Pulley, Nashville, Tennessee, for the appellee, Geoffrey Cale Vermilyea.

# OPINION

## Background

Husband met Wife in the summer of 2002 in Ontario, Canada, where Wife was born and raised. They dated "on-again-off-again" long-distance for several years. During the summer of 2007, Wife lived with her aunt and uncle in Dickson, Tennessee while the parties dated.

Husband and Wife were married in December of 2007, and Wife moved to Tennessee. During the first several months of the marriage, Wife was completing school. In 2008, after completing school, Wife began working at Dickson Pediatric Dentistry. Wife worked there until the birth of Cale in 2013.

In 2008, several months after the parties were married, Husband gained custody of his child from a previous relationship ("Grant"). At the time of trial, Grant was nine years old. Cale was born in 2013. Cale was two years old at the time of trial. Husband admitted that Wife helped him care for Grant during the marriage. Husband and Wife agreed that after Cale's birth Wife would stay at home with Grant and Cale while Husband worked outside of the home. At trial, Husband agreed that Wife has had primary responsibility for both children. He also admitted that both children were doing well and have flourished under Wife's care.

Husband asked to be named Cale's primary residential parent and requested 50/50 time with Cale. Husband also asked to be awarded the marital residence, which is right down the road from his parents' house.

Husband has been living with his parents since he filed for divorce. Husband was asked where Grant stays, and Husband stated: "He sleeps in a bed with me. It's tight right now with my brother and sister-in-law and their child living in the basement. Of course, my parents and Grant and I and Cale on the weekends when I have him, we stay on the main floor." Husband testified that Grant and Cale are "[v]ery close. [Grant] looks forward for him to come over every afternoon and play and ride bikes and swim. They have a good time together." Husband testified that Cale would be three "next month." Husband testified that he, not his mother or his father, takes care of Cale unless he needs assistance. Husband purchases food and diapers for Cale.

Husband was asked to describe his relationship with Cale, and he stated: "It's super fun. Cale is growing more and more every day and I get to see him every day after work. It's fun spending time with him, going swimming, and playing in the dirt, riding bikes." Husband sees Cale "four nights after work and then my weekend. So it's like I

have him 11 days straight and then it's [Wife's] weekend to have him." Husband agreed that since he and Wife separated, Wife has had Cale 75 percent of the time and Husband has had him 25 percent.

Husband described his relationship with Cale prior to Husband's filing for divorce stating:

> When I would get home I would spend time with him while [Wife] made dinner or if she needed to work on her eBay things. And then usually we'd eat dinner together. And while she cleaned up the kitchen, I would give him a bath, get him ready for bed, and put him down for the night.

Husband testified that Wife has taken Cale to Canada to visit five times during the past year and a half. The last time they went for two weeks. Husband stated that he "was to be made up the two weeks when she got back. And I got three extra days with him and she said that I had made up my time." Husband also testified that he did not get extended parenting time during the summer. Husband insisted that he wants Wife to be able to visit her family, but admitted that Wife had to go to court to get permission to visit the last time because he opposed it. Husband admitted that he told Wife "It's not fair for you to have a big block of time because I can't take off a big block of time with him."

Husband testified that he goes to work at 5 a.m. and is off "in the range from 3:00 to 5:00." Husband testified that his mother is home with Grant some days during the week and that Grant also attends daycare. He explained that his mother or father would take Cale to daycare since Husband has to be at work at 5 a.m.

Husband is a self-employed contractor for Comcast. He makes $22.50 an hour. He listed his income on his income and expense statement as $3,060 per month. Husband also works "side jobs," and he testified that he made $580 last year from these jobs. Husband testified that he made $44,281 the year prior to trial. He was asked about his claim that he makes $3,060 per month, which would be $36,720 per year, when his tax returns showed that he made $8,000 more than that during the last year. Husband admitted that he claimed that he made $3,060 monthly on his income and expense statement because that was what he made during the month before he filed for divorce. Husband stated that he may have used numbers from 2014 when making the calculation. When questioned further, Husband admitted that his income and expense statement is not a true reflection of what he is earning. He admitted that he also works side jobs and does not report this income on his tax return.

When questioned, Husband insisted that he never has had a side business of buying and selling motorcycle parts. He admitted, however, that he took multiple loans

from the Bank of Dickson in 2012 and 2013, which he told the bank were for the purpose of purchasing motorcycle parts for resale. Husband insisted that he did not lie to the bank, and he did not lie in court. He stated: "It's not - - it's not a business. It's for a hobby. And I've always done that. It's not - - I'm not making money on it. If I buy something, I'll buy it to where I can keep some of the parts to help out my hobby and resell it to get my money back." Husband was asked why if he was struggling to make ends meet and couldn't afford medicine for his child, he borrowed $5,800 in 2013 to buy and sell motorcycle parts, and he stated: "Grant was not on medication in 2013."

Husband admitted that he told Wife in April of 2015 that he didn't have enough income to pay his taxes because he had not paid his estimated quarterly payments. He stated that he owed $7,000. Around this same time, Husband took a loan for $10,000 at 14.206 percent interest. He admitted that he stated in the "Truth in Lending Disclosure" for this loan that the purpose of the loan was personal, to purchase motorcycle parts. Husband stated: "The 7,000 was for taxes. The 3,000 I was going to purchase third-bike parts in order to recoup some of my money. [Wife], after finding out about the loan, that was the final straw, she wanted a divorce. The 3,000 went towards attorney's fees."

Husband was asked why he was borrowing $3,000 for motorcycle parts, and he stated: "To try to sell and make some money to recoup to pay off taxes." He then was asked why he asserted that was not a business if he was earning money, and he stated: "If that would have happened, yes, that would have been a business." Husband insisted it wasn't a business because "I never made money off of it." When pressed, Husband admitted that he had "made money off of parts selling to recoup my money." He then was asked why he had stated earlier that he never made money off it, and he stated: "You're - - I'm having a hard time following which scenario you're talking about. You're talking about the loan with the Bank of Dickson and I'm trying to follow where you're going. You said you're trying to wrap your head around it. I'm doing the same thing." Husband was asked if he purchased something for one dollar and sold it for $2 would he have made money, and he admitted that he would have. Husband then was asked if he had done that with motorcycle parts, and he admitted that he had "[a] few times, yes, ma'am." Husband admitted that this income was not reflected on his income and expense statement.

After being shown sign-out sheets from the daycare for Grant, Husband admitted that he really wasn't getting off work until close to 4:30 or 5 p.m. and that he did not anticipate that situation changing. He admitted that he would not be picking Cale up at 3 p.m. to do homework and things. Husband admitted that he depends upon his family to help him with Cale.

Wife testified that she was 29 years old at the time of trial. Wife has an aunt, uncle, and three cousins who live in Tennessee about 30 minutes from Wife's home. Wife's aunt helps Wife with Cale.

Wife testified that Husband has spent time with Cale almost every day during the pendency of the divorce, whether it was an hour or several hours. She stated that after they separated Husband "did start playing an active role [in Cale's care]." Wife admitted that Husband takes good care of Cale.

Wife testified that she wants to relocate to Canada with Cale to be close to her family so they can assist her with childcare. Wife proposed a parenting plan giving Husband 99 days a year with Cale until Cale starts school and then 79 days per year. When asked, Wife admitted that she would be unwilling to take 99 days per year. She stated:

> I believe I should be the primary residential parent. I have been Cale's caregiver from birth. For the past three years I've been a stay-at-home parent taking care of his everyday needs. We have a very strong bond. It is my hope that I will be the primary residential parent and continue to have that same relationship with Cale. . . . I think having the opportunity to relocate back to where my family is and where I come from would give Cale the best opportunity to succeed. Because I would be able to become more financially secure. I would have the support of my family. And it would just be able to give Cale the best of both worlds. He would still have his visitation with his father and I would be able to provide a good life for Cale.

Wife did not prepare a proposed plan for staying in Tennessee, but stated that she would still like to be awarded primary custody of Cale if her request to relocate to Canada were denied.

Wife admitted that she agreed to give Husband two weeks to make up his missed parenting time when she and Cale went to visit Canada. She insisted that she had done so. Wife stated that Husband "chose to make up the time as he could on weekends." She stated:

> Because what I originally suggested was that we swap two weeks for two weeks. So I would go to Canada for two weeks and then he would have two weeks here. Keeping in mind that during that two-week period, you know, typically overnight visits and through the day I would be having him

5

and then in the evenings [Husband] would take him. So if you just do an exchange, if you will, it would all kind of even out.

But since he decided to make it up on weekends, I just looked at the time that he missed - - the visitation time that he missed with Cale while I was away and made it up that way.

When pressed, Wife admitted that Husband did not get two weeks, but got some sort of made-up time. When pressed further about this not being what she agreed to, Wife stated: "He elected not to take two weeks." Wife testified that she offered to allow Husband to make up the missed parenting time on the weekends. When asked if that would be 14 days of weekend time, Wife stated: "If I had given him 14 days of my weekend time, it would have ended up being a lot more visitation that he would have had with Cale as opposed to exchanging a two-week period with a two-week period." Wife was asked why 14 days was not 14 days, and she stated: "I don't know if I'm making myself clear on that. But during that two-week period there are certain weekends that would be his, certain that are mine. During the day would be - - . . . ." Wife was asked if Husband got two weeks, and she stated: "He made up the visitation time that he missed." Wife finally admitted that Husband had not been allowed to make up his 14 days of missed parenting time.

Wife testified that she began working in a dental office as a receptionist in 2008 making $18 an hour and working approximately 32 to 36 hours per week. When questioned, Wife admitted that "[a]t one point" she was the office manager and that she is "able to do managerial positions as well."

Since Cale's birth, Wife has been a stay-at-home mother. Wife admitted that during the parties' separation, she has continued to be a stay-at-home mother. Husband continued to pay all of the marital bills since filing for divorce. Wife admitted that she is physically able to work. Wife was asked if she had made any attempt to find a job during the parties' separation, and she stated that she had done some babysitting for a friend. Wife stated that she babysat for three or four weeks and earned approximately $150 per week. When asked if there was a reason why she had not attempted to obtain a job, Wife stated:

Yes. I've been continuing to be a stay-at-home mom waiting for the final hearing to determine whether or not I can relocate. Also, with the current visitation plan that we have in place, finding full-time employment and satisfying that agreement would be difficult. . . . With [Husband's] work schedule getting off work at a different time every day, I wouldn't - - I could not be available for him to pick up Cale at those times.

6

Wife was asked why Husband could not pick Cale up from daycare, and she stated: "I would like to be the primary residential parent, and so I would like to be able to do that myself. I would like to have a more permanent visitation schedule in place just to have that routine." When questioned further, Wife admitted that she has not looked for work because she wants to be a stay-at-home-mom and because she did not know if she would be allowed to relocate to Canada with Cale. Wife testified that she has looked to see what jobs are available in Canada.

Wife prepared an income and expense statement for if she stays in Tennessee, which lists details of monthly expenses totaling over $5,700. This income and expense statement, however, does not contain an income, even an estimated one. Instead, the space for gross monthly wages is blank and the space for net monthly income states "unknown." Wife testified that if she is required to stay in Tennessee, she is requesting alimony.

Wife testified that she purchases items to resell on eBay. Wife testified that the money she earns from eBay goes into her PayPal account. Wife uses her PayPal MasterCard to pay for groceries, gas, diapers, etc. She testified that her family has helped her pay several thousand dollars on her PayPal MasterCard over the past year. Wife claimed zero income on her taxes because she did not consider her eBay income as a business. Wife testified that she made $6,756 through Craigslist in 2016, but that it cost her $3,300 to buy the items she sold on Craigslist and that she also had to pay fees, shipping, and mileage.

Wife testified that Cale is a dual citizen of the United States and Canada. She testified that Cale would receive benefits if he lived in Canada. When questioned further, Wife admitted that the Canadian child benefit is based upon income amount. Wife admitted that in order for Cale to get health benefits in Canada, Cale would need to be present in the province for 153 of the first 183 days after establishing residency. Wife testified that Cale would start school in Canada at the age of 4 not 5, but stated that they could agree to start him at age 5.

After trial, the Trial Court entered its Final Decree, *inter alia*, granting the parties a divorce, dividing the marital assets, and entering a Permanent Parenting Plan ("Parenting Plan"). The Trial Court denied Wife's request to relocate to Canada with Cale, but designated Wife as the primary residential parent with Husband to have parenting time every week-end and during specified holidays and vacation times. Wife filed an appeal of the Trial Court's Final Decree.

## Discussion

Although not stated exactly as such, Wife raises four issues on appeal: 1) whether the Trial Court erred in denying Wife's request to relocate to Canada with Cale; 2) whether the Trial Court erred in entering the Parenting Plan allegedly following the Dickson County school calendar which granted Husband parenting time every Friday to Sunday; 3) whether the Trial Court erred in denying Wife alimony; and, 4) whether Wife is entitled to an award of attorney's fees on appeal.

We first consider whether the Trial Court erred in denying Wife's request to relocate to Canada with Cale. This issue involves the Trial Court's determination regarding the custody of Cale. As our Supreme Court has instructed:

> We begin with the standard of review. In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d at 692.

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Armbrister v. Armbrister*, 414 S.W.3d at 693. Determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn.2001)).

> A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Armbrister v. Armbrister*, 414 S.W.3d at 693 (citing *Eldridge v. Eldridge*, 42 S.W.3d at 88). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning

8

that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d at 88).

*Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014).

When making a determination in a divorce proceeding regarding custody of a minor child, a court is to consider the factors contained in Tenn. Code Ann. § 36-6-106, which provides, in pertinent part:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any

history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.  The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3).  The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person.  The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older.  The court may hear the preference of a younger child upon request.  The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (Supp. 2016). "While the trial court is directed to consider the appropriate factors in reaching its decision, it is not required to list each factor with the court's conclusion about how that factor impacted the custody decision." *Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549, at *6 (Tenn. Ct. App. March 6, 2013), *no appl. perm. appeal filed*.

In her brief on appeal, Wife argues that the Trial Court incorrectly applied Tenn. Code Ann. § 36-6-108, the parental relocation statute, rather than Tenn. Code Ann. § 36-6-106 when making its decision about Wife's request to relocate to Canada with Cale. This Court, in a series of cases, has stated that the parental relocation statute, Tenn. Code Ann. § 36-6-108, is not to be applied when a court is making an initial custody determination. *E.g., Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549 (Tenn. Ct. App. March 6, 2013), *no appl. perm. appeal filed*; *Nasgovitz v. Nasgovitz*, No. M2010-02606-COA-R3-CV, 2012 WL 2445076 (Tenn. Ct. App. June 27, 2012), *no appl. perm. appeal filed*. Furthermore, the parental relocation statute itself provides that it is to be applied "[a]fter custody or co-parenting has been established by the entry of a permanent parenting plan or final order, . . . ." Tenn. Code Ann. § 36-6-108(a) (Supp. 2016).

Wife asserts that the Trial Court "abused its discretion in applying an incorrect legal standard" and further asserts that the Trial Court "did not make it clear whether it applied the best interest of the child analysis when it denied [Wife's] move." Wife also asserts that "the disputed finding that [Wife] wanted to relocate to deter [Husband's] visitation implies that the trial court looked at the move away statute's factors." Wife is mistaken.

In its Memorandum Opinion incorporated as an exhibit to the Final Decree, the Trial Court specifically stated that it was applying the factors set out in Tenn. Code Ann. § 36-6-106 when making its determination regarding the custody of Cale. Furthermore, a careful and thorough review of the Trial Court's Final Decree reveals that the Trial Court considered the relevant factors contained in Tenn. Code Ann. § 36-6-106 in light of the evidence presented. Specifically, the Trial Court found and held:

> As to [Wife's] desire to move to Canada, she testified that she wished to move back in with her parents and look for a job. Her plan was that her parents would keep Cale and she would search for a job. She admitted on cross-examination that there were numerous job positions in

dental offices that were advertised in the Middle Tennessee area but she has not looked for any employment. Both parties have had disagreements regarding visitation prior to this final hearing. It is apparent that there is continuing animosity which does not bode well for the hope that both parties will work together for the best interest of the child.

In determining custody, the Court considers the factors set out in T.C.A. 36-6[-]106. Certainly both parents are involved with Cale. [Wife] has been performing the majority of responsibility by virtue of staying at home with Cale while [Husband] was the breadwinner. At this time, the Court has not seen any evidence that both parties can work together for the best interest of the child. Based on testimony and observations of witnesses as they testified, the Court has concerns that [Wife] will be less likely to work with [Husband] regarding visitation issues. It would appear that [Wife] has control issues and the Court feels that [Wife's] move to Canada is part of her desire to control or deter visitation with the father. Also, there has been evidence placed before the Court that Cale has a close relationship with his older half-brother and his extended family. Cale has lived in the same home and has had the benefit of an extended family on both the father's side as well as his mother's relatives who reside in Dickson County, Tennessee. [Husband] has testified that his work schedule is such that his mother can take Cale to daycare and he is able to pick him up after work.

These findings made by the Trial Court concern the relevant factors contained in Tenn. Code Ann. § 36-6-106. Furthermore, the evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings.

Wife also argues that the Trial Court erred when it specifically found:

Based on testimony and observations of witnesses as they testified, the Court has concerns that [Wife] will be less likely to work with [Husband] regarding visitation issues. It would appear that [Wife] has control issues and the Court feels that [Wife's] move to Canada is part of her desire to control or deter visitation with the father.

Wife asserts "there is nothing in the record that would warrant such a finding," and that the Trial Court "reached an illogical conclusion that can not be based on anything but a clearly erroneous assessment of the evidence." Wife is mistaken.

Both parties testified about Wife's last trip to Canada with Cale, which lasted for two weeks. Husband was to be allowed to make up the parenting time that he missed while Wife and Cale were away, but the evidence shows that Wife did not allow Husband to make up this parenting time. Furthermore, the record on appeal reveals that when questioned about this subject during trial, Wife repeatedly insisted that Husband had made up the time somehow although she could not explain how. After numerous questions about this subject, Wife finally admitted that she had not allowed Husband to make up all the parenting time that he had missed. The Trial Court further found, and the evidence in the record on appeal shows, that the parties "have had disagreements regarding visitation prior to this final hearing," and that "there is continuing animosity," which raised concerns for the Trial Court regarding the parties' ability to "work together for the best interest of the child." Additionally, when questioned about why she has not looked for a job, Wife testified that she had not done so because she was waiting to see if she would be allowed to relocate to Canada and because she needed to be available when Husband picked up Cale. When asked why Husband could not pick Cale up at daycare, Wife testified that she wanted to be the one who did this. The Trial Court had the ability to observe the witnesses as they testified, assess their demeanor, and evaluate their credibility, and the Trial Court properly took its assessment into account when making its findings. The evidence in the record on appeal does not preponderate against the Trial Court's finding that Wife's "move to Canada is part of her desire to control or deter visitation with the father."

The evidence in the record on appeal does not preponderate against any of the Trial Court's findings with regard to custody. We find and hold that the Trial Court did not apply an incorrect standard when making its determination regarding custody, and we find no error in the Trial Court's determination regarding the custody of Cale and its determination that it was not in Cale's best interest to relocate to Canada. The Trial Court exercised its discretion in a way so as to give effect to our General Assembly's policy determination that it is in a child's best interest for a custody arrangement to provide for "the maximum participation possible in the life of the child consistent with . . . all relevant factors . . . ." Tenn. Code Ann. § 36-6-106(a) (Supp. 2016).

We next consider whether the Trial Court erred in entering the Parenting Plan allegedly following the Dickson County school calendar which granted Husband parenting time every Friday to Sunday. As with the issue discussed above, this issue implicates the Trial Court's discretionary decision.

With regard to this issue, Wife asserts that the Trial Court erred in entering the Parenting Plan, which, she asserts, follows the Dickson County school calendar. A careful and thorough review of the record on appeal, however, does not support this assertion. The Parenting Plan named Wife the primary residential parent and granted

Wife 236 days with Cale. Husband was granted 129 days with Cale. Specifically, the Parenting Plan provides that Husband shall have Cale from Fridays at 6:00 p.m. until Sundays at 6:00 p.m., on specified holidays in alternating years, and for fall vacation and spring vacation in alternating years. The Parenting Plan further provides that the parties will divide the winter or Christmas vacation and provides that each party will have parenting time during the summer vacation.

The Parenting Plan does not refer to any specified school calendar and is phrased to allow for parenting time when Cale reaches school-age without regard to the specific school system Cale attends. For instance, the Parenting Plan states: "[Wife] shall have the child for the Fall Vacation from school in odd numbered years and [Husband] having the child in even numbered years." Without regard to how long Cale's fall vacation lasts or when it begins or ends, Wife shall have Cale during such time in odd numbered years and Husband shall have him in even numbered years. If the school that Cale winds up attending does not have a fall vacation, then the normal day-to-day parenting remains in place and neither parent will have that specific fall vacation parenting time. We perceive no unfairness whatsoever with this plan, and can discern no reference whatsoever within the Parenting Plan to any specific school system calendar. Wife's argument is without merit.

Wife also asserts that the Trial Court erred in granting Father parenting time every Friday to Sunday. Again, we point out that Wife was named the primary residential parent and was granted 236 days per year with Cale, and Husband was granted 129 days. Furthermore, we note that the Parenting Plan grants Wife the major decision making in all areas, including educational decisions, non-emergency health care decisions, decisions with regard to religious upbringing, and decisions about extracurricular activities.

Wife argues in her brief on appeal that she will need to obtain a job and that there was "no proof in the record that [Wife] was looking for a job that had weekend hours." Wife asserts that the Trial Court should have granted her some weekend time with Cale. We note that Wife testified at trial that she wants to be the one to pick Cale up from daycare. We further note that the proof in the record on appeal shows that during the parties' separation Wife made no attempts whatsoever to obtain employment. The Trial Court fashioned a Parenting Plan that will allow Wife to be the one to pick up Cale from daycare everyday, as Wife testified at trial was her desire.

Wife is requesting this Court to tweak the Trial Court's Parenting Plan. We decline to do so. As our Supreme Court has instructed: "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Kelly v. Kelly*, 445 S.W.3d at 692 (quoting *Armbrister v. Armbrister*, 414 S.W.3d at 693).

Next, we consider whether the Trial Court erred in denying Wife alimony. As our Supreme Court has instructed:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor. . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but " 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.' " *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011) (footnote omitted).

"Current Tennessee law recognizes several distinct types of spousal support, including (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36–5–121(d)(1)." *Id*. at 107. In *Gonsewski v. Gonsewski*, our Supreme Court provided a helpful overview of the four types of alimony explaining:

> The first type of spousal support, alimony in futuro, is intended to provide support on a long-term basis until the death or remarriage of the recipient. Tenn. Code Ann. § 36–5–121(f)(1). This type of alimony can be awarded where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." *Id*.
>
> * * *
>
> The second type of support, alimony in solido, is also a form of long-term support. The total amount of alimony in solido is set on the date of the divorce decree and is either paid in a lump sum payment of cash or property, or paid in installments for a definite term. Tenn. Code Ann. § 36–5–121(h)(1); *Broadbent*, 211 S.W.3d at 222 ("Alimony *in solido* consists of a definite sum of money that is paid in a lump sum or in installments over a definite period of time."). "A typical purpose of such an award would be to adjust the distribution of the parties' marital property." *Burlew*, 40 S.W.3d at 471. Alimony in solido "may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate." Tenn. Code Ann. § 36–5–121(d)(5).
>
> * * *
>
> In contrast to alimony in futuro, rehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other

spouse. *See* Tenn. Code Ann. § 36–5–121(e)(1). *See also Robertson*, 76 S.W.3d at 340–41; *Riggs*, 250 S.W.3d at 456 n.4. Rehabilitative alimony thus serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. *Robertson*, 76 S.W.3d at 340–41; *Isbell v. Isbell*, 816 S.W.2d 735, 738–39 (Tenn. 1991).

* * *

The fourth category of support, transitional alimony, is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Tenn. Code Ann. § 36–5–121(d)(4), (g)(1); *Riggs*, 250 S.W.3d at 456 n.5. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." *Mills v. Mills*, No. M2009-02474-COA-R3-CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010); *see also Montgomery v. Silberman*, No. M2009-00853-COA-R3-CV, 2009 WL 4113669, at *2 (Tenn. Ct. App. Nov. 24, 2009) (affirming trial court's award of transition alimony to wife "to bridge the gap, so to speak, between her married life and single life."); *Engesser v. Engesser*, 42 So.3d 249, 251 (Fla. Dist. Ct. App. 2010) (en banc) (describing transitional alimony as "[b]ridge-the-gap alimony" designed to "smooth the transition of a spouse from married to single life."). In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income.

*Id*. at 107-09.

In her brief on appeal, Wife argues that she should have been awarded rehabilitative or transitional alimony. Wife does not argue that an award of alimony in futuro or alimony in solido would have been appropriate, and we do not find that an award of either alimony in futuro or alimony in solido would have been appropriate. We, thus, will consider whether the Trial Court abused its discretion in refusing to award either rehabilitative or transitional alimony.

Wife argues in her brief on appeal that the Trial Court should have awarded her rehabilitative alimony. Wife, however, produced no evidence whatsoever showing that

she either needed or wanted to obtain "additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce." *Id.* at 108. The evidence in the record on appeal shows that Wife was 29 years old at the time of trial. The evidence further shows that Wife had obtained an education and had worked in a dental office prior to the birth of Cale. Although Wife had been a stay-at-home mother since the birth of Cale, the evidence in the record on appeal shows that at the time of trial, Cale was not yet three years old. As such, Wife had been out of the work force for only a few years. The Trial Court found that Wife "is able-bodied and has sufficient marketable skills that will allow her to obtain employment and support herself . . . ." The evidence in the record on appeal does not preponderate against these findings. The record on appeal is devoid of evidence upon which the Trial Court properly could have based an award of rehabilitative alimony. Wife failed to prove that an award of rehabilitative alimony would be appropriate.

In the alternative, Wife argues that the Trial Court should have awarded her transitional alimony. When making a determination with regard to whether to award alimony, a court shall consider the factors contained in Tenn. Code Ann. § 36-5-121, which, in pertinent part, provides:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;

18

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2014). Our Supreme Court has instructed:

Although each of these factors must be considered when relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Riggs*, 250 S.W.3d at 457. *See also Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 342; *Burlew*, 40 S.W.3d at 470. Carefully adhering to the statutory framework for awarding spousal support, both in terms of awarding the correct type of support and for an appropriate amount and time, fulfills not only the statutory directives but also alimony's fundamental purpose of eliminating spousal dependency where possible.

*Gonsewski*, 350 S.W.3d at 110.

Wife asserts in her brief on appeal that "the trial court clearly left the wife in a financial disaster." We disagree. The Final Decree provided that Husband would retain the marital residence and would refinance it within sixty days. Funds from the refinance then would be used to pay off much of the marital debt including, among other things, the loan on Wife's vehicle, Wife's medical debt from a surgery, and Wife's PayPal MasterCard. The remaining proceeds from the refinance then would be divided between the parties. The Final Decree further provided that until Husband refinanced the marital residence and Wife received her portion of the proceeds, Wife would remain in the marital residence and Husband would continue to pay the same expenses that he had been paying during the pendency of the divorce. Wife also was awarded a number of items of marital property including such things as furniture, linens, a laptop, a camera, a camcorder, various small appliances, and a grill. Husband was awarded motorcycle parts, which were determined to be marital property, and was ordered to pay Wife $2,000, which represented one-half of the value of the motorcycle parts. Thus, pursuant

to the Final Decree, Wife received significant marital assets and is leaving the marriage with little to none of the marital debt. Furthermore, the Trial Court provided that until Wife receives her portion of the proceeds from Husband's refinance of the marital residence, Wife may remain in the marital residence with Husband continuing to "pay the same expenses that he has been paying during the pendency of this action." The Trial Court specifically found that "[t]he proceeds wilt [sic] be sufficient to assist her until she has found employment." Thus, the Trial Court's distribution of the marital assets provided Wife a bridge from married life to single life. This hardly constitutes "a financial disaster." In denying Wife alimony, the Trial Court specifically found that Wife "is able-bodied and has sufficient marketable skills that will allow her to obtain employment and support herself . . . ." As the evidence in the record shows, Wife's financial problems at trial resulted primarily from Wife's refusal to get a job. Reasonable minds could disagree about the propriety of the Trial Court's decision as to transitional alimony, the very essence of a discretionary decision. We find no abuse of discretion in the Trial Court's decision regarding alimony.

Finally, we consider whether Wife is entitled to an award of attorney's fees on appeal. In the exercise of our discretion, we decline to award either party attorney's fees on appeal.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Jessica Lynn Vermilyea, and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE